UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL A. LUCIANO, B30219, ) | |
| ) | |
| Petitioner, ) | |
| ) | Case No. 14-cv-5912 |
| v. ) | |
| ) | Judge John W. Darrah |
| RANDY PFISTER, Warden, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Michael A. Luciano, proceeding *pro se*, filed a Petition for Writ of *Habeas Corpus*, pursuant to 28 U.S.C. § 2254, against Respondent Warden Randy Pfister. For the reasons stated below, Luciano's Petition is denied. Additionally, a certificate of appealability shall not issue.

## BACKGROUND

In 2008, a Kane County, Illinois jury found Petitioner guilty of the first-degree murder of Willie Arce. (State Ct. Rec. Exh. A at p. 1.) The trial court imposed a thirty-eight-year prison term. (*Id*.) The relevant facts developed in state court are presumed to be correct, absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1). In June 1989, Petitioner shot Willie Arce in his home because he stole money from the Aurora Latin Kings. (State Ct. Rec. Exh. A at p. 1.) The following testimony, as it relates to Petitioner's arguments on federal *habeas* review, was presented at trial.

Willie's sister, Myra Arce, testified that in 1989, Willie was a member of the Aurora Latin Kings gang. (State Ct. Rec. Exh. A at 2.) Willie was living in the basement of his home. (*Id*.) That summer, Willie was trying to leave the gang. (*Id*.) On the night of the shooting, Myra

heard gunshots from the basement of the home and saw Willie crawling up the stairs after being shot with either a .32 or .30 caliber firearm. (*Id* at 3.) He later died from his wounds. (*Id*.)

Investigators at the scene of the crime discovered holes in a basement window, a bamboo curtain covering the window, and the pillow and headboard on the bed, both of which were in line with the window. (*Id*.) Approximately three weeks before the shooting, Myra witnessed Petitioner and Willie yelling at each other in front of the house. (*Id.* at 3.) Petitioner yelled that Willie was "out of the box." (*Id*.)

Carlos Escalante, a former member of the gang, became a police informant in 2005, after learning that the gang was trying to harm him. (*Id*. at 4.) During the summer of 1989, Escalante was responsible for security and gathering information about rival gangs. (*Id*. at 5.) Escalante was unaware that the gang was at war with any other rival gangs. (*Id*. at 8.) Escalante knew that in 1989, Willie had a drug habit and that money went missing while Willie was the gang treasurer. (*Id.* at 5.) As a result, Willie was supposed to receive a "violation," or physical punishment. (*Id*.)

On the night of the shooting, Escalante was working security for gang narcotics sales near the Brady School. (*Id*.) When Escalante saw emergency vehicles drive towards Willie's street, he approached Willie's home and saw him being carried away on a stretcher. (*Id*. at 6.) On his return back to the school, Escalante spoke with Petitioner, who told him that he had shot Willie through the basement window. (*Id*.) Petitioner then showed Escalante a .30 or .32 caliber revolver. (*Id*.)

Juan Acevedo was also a member of the gang and worked security in 1989. He was no longer in good standing with the gang at the time of the trial. (*Id*. at 8.) Acevedo testified that although he recalled a gang war with a rival gang, the Deuces, in 1989, he believed that the

2

shooting was unrelated to that conflict. (*Id*. at 9.) Prior to the shooting, Angel Luciano, the leader of the gang, ordered Acevedo to give Willie a violation at a church festival. (*Id*.) However, Acevedo was unable to do so. (*Id*.)

Alex Ramos was also a member of the gang until he left in 1999. (*Id*. at 10.) Ramos also knew that Willie was supposed to receive a violation. (*Id*.) He refused to carry it out because he was dating Willie's sister, Myra. (*Id*.) Ramos witnessed a failed violation on Willie that was thwarted when Willie pulled out a gun and fired it into the air. (*Id*.) Later that day, a group of gang members – including Ramos, Petitioner, and Angel Luciano ("Luciano") – gathered at the home of Maribel Rodriguez, known as "Queen Mari." (*Id*. at 10-11.) At that meeting, Luciano was angered when Petitioner informed him about the failed violation attempt. (*Id*. at 11.) After Willie was shot, Luciano instructed Ramos to say Petitioner was out of town if police questioned him. (*Id.*) Police did question Ramos, and he told them that Petitioner was out of town. (*Id*.)

Jose Hernandez, a member of the gang in 1989, was also aware that Willie was "on the run" from the gang. (*Id*. at 12.) Hernandez was also aware that Willie had avoided a violation by firing a gun in the air. (*Id*.) Following the failed attempt, Hernandez heard Luciano order someone to shoot Willie, but not kill him. Hernandez also heard Petitioner volunteer to do the job. (*Id*. at 12, 29.) After the shooting, Petitioner informed Hernandez that he was the shooter. (*Id*.) He told Hernandez that he tried to shoot Willie in the leg but instead hit him in the stomach. (*Id* at 13.)

The jury found Petitioner guilty of first-degree murder, and the trial court imposed a 38 year prison term. (*Id*. at 1.) Petitioner appealed, arguing that: (1) the evidence was insufficient because it was based on unreliable testimony; (2) prior to trial, former gang-member witnesses were held in the same room at the federal jail, and the prosecutor erred in failing to correct

3

witness Carlos Escalante's false testimony denying that fact; (3) the trial court erred in barring the admission of Escalante's prior convictions for impeachment purposes; and (4) the trial court erred in admitting the testimony of the prosecution's gang expert. (Resp. Ans. at 4-5; *See* State Ct. Rec. Exh. B.) The Illinois state appellate court affirmed Petitioner's conviction. (*See* State Ct. Rec. Exh. A.) Petitioner then filed a petition for leave to appeal (PLA), containing only Claim 3, above, which was denied by the Illinois Supreme Court. (Resp. Ans. at 5; *See* State Ct. Rec. Exh. D and E.)

In 2011, Petitioner filed a postconviction petition in the Circuit Court of Kane County. (*Id.*; *See* State Ct. Rec. Exh. F.) Petitioner alleged that: (1) the prosecution presented the false testimony of Carlos Escalante, Alex Ramos, and Jose Hernandez that Petitioner was the shooter; (2) the prosecution presented false testimony to the grand jury that the pre-shooting meeting occurred at Queen Mari's house, even though she had sold the house two months prior to the shooting, in April 1989; (3) the prosecution failed to disclose that witnesses Escalante, Acevedo, and Hernandez had been housed together before trial; (4) trial counsel was ineffective for failing to object to the trial court's failure to comply with Illinois Supreme Court Rule 431(b), to object upon learning that witnesses had been housed together, effectively cross-examine witnesses and call Escalante as a defense witness, to preserve in a post-trial motion the claim that Escalante testified falsely about being housed with the other witnesses, to preserve in a post-trial motion the objection to the trial court's decision barring admission of Escalante's prior conviction for impeachment purposes, to investigate the sale of Queen Mari's house; and (5) appellate counsel was ineffective for failing to raise meritorious issues on direct appeal, including the putative violation of Illinois Supreme Court Rule 431(b). (*Id.* at 5-6; *See* State Ct. Rec. Exh. F.) The trial court dismissed the postconviction petition. (*See* State Ct. Rec. Exh. G.) On appeal, Petitioner

claimed that trial counsel was ineffective for failing to object to the trial court's failure to comply with Illinois Supreme Court Rule 431(b), and to investigate the sale of Queen Mari's house, and that appellate counsel was ineffective for failing to raise the violation of Illinois Supreme Court Rule 431(b) on appeal. (*Id*. at 6; *see* State Ct. Rec. Exh. H.) The state appellate court affirmed. (*Id*.; *see* State Ct. Rec. Exh. K.) Petitioner's PLA, containing those same three arguments, was unsuccessful. (*Id*.; *see* State Ct. Rec. Exh. M and L.)

On July 31, 2014, the district court received Petitioner's timely *pro se* petition for a Writ of *Habeas Corpus*. (*Id*.; *see* Dkt. 1.) The petition raises the following claims:

A. the evidence was insufficient because it is based on unreliable testimony (Dkt. 1 at 5-6);

B. prior to trial, former gang-member witnesses were held in the same room at the federal jail, and the prosecutor failed to correct witness Carlos Escalante's false testimony denying that fact (*id*. at 6-9);

C. the trial court erred in barring the admission of Escalante's prior convictions for impeachment purposes (*id*. at 9-11);

D. the trial court erred in admitting the testimony of the prosecution's gang expert (*id*. at 12-13);

E. evidence showing that Queen Mari did not own the home at the time of the gang meeting in June 1989 undermines the testimony of prosecution witnesses (*id*. at 13-17);

F. the prosecution presented the false testimony of Carlos Escalante, Alex Ramos, and Jose Hernandez that petitioner was the shooter (*id*. at 17-20);

G. the prosecution presented false testimony to the grand jury that the pre-shooting meeting occurred at Queen Mari's house, even though she had sold the house two months prior to the shooting in April 1989 (*id*. at 20-21);

H appellate counsel was ineffective for failing to raise trial errors on direct appeal, including the argument that the trial court violated Illinois Supreme Court Rule 431(b) (*id*. at 21-24, 32-33);

5

I.  the prosecution failed to disclose that witnesses Escalante, Acevedo, and Hernandez had been housed together before trial (*id*. at 24-29); and

J.  trial counsel was ineffective for failing to:

1. object to the trial court's failure to comply with Illinois Supreme Court Rule 431;

2. object upon learning that Escalante, Acevedo, and Hernandez had been housed together;

3. effectively cross-examine Escalante and call him as a defense witness;

4. preserve in a post-trial motion the claim that Escalante testified falsely about being housed with the other witnesses;

5. preserve in a post-trial motion the objection to the trial court's decision to bar the admission of Escalante's prior conviction for impeachment purposes; and

6. investigate the sale of Queen Mari's house and impeach Ramos with that information (*id*. at 21, 29-32).

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this Court's authority to grant petitions for *habeas corpus*. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Historically, *habeas corpus* relief has been viewed as "an extraordinary remedy, 'a bulwark against convictions that violate fundamental fairness.'" *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1933) (quoting *Engle v. Isaac*, 456 U.S. 107, 126 (1982)) (other internal citations omitted). It provides that relief may not be granted to any claim adjudicated on the merits in a state court proceeding unless the claim "was contrary to, or involved an unreasonable application of Supreme Court precedent" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d)(1); *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010). The federal court deferentially reviews the decision of the last state court. *Griffin v. Pierce*, 622 F. 3d 831, 841 (7th Cir. 2010). State court factual findings are presumed to be correct unless the petitioner rebuts this presumption with "clear and convincing evidence." *Schriro*, 550 U.S. at 474 (citing 28 U.S.C. § 2254(e)(1)).

Before a federal court can address the merits of a § 2254 petition, the petitioner must satisfy several procedural steps in state court. 28 U.S.C. § 2254(b)(1). The petitioner must have given "the state courts a fair opportunity to address his claims and to correct any error of constitutional magnitude." *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001) (internal citations omitted). Specifically, the petitioner must have "fairly presented" each of his *habeas* claims to the state's appellate and supreme courts, including the underlying operative facts and controlling legal principles for each claim. *McKee*, 598 F.3d at 382; *see also Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007). Failure to present each claim to the state judiciary leads to procedural default of that claim and bars the federal court from reviewing the claim's merits. *McKee*, 598 F.3d at 382. Furthermore, a federal court will not review a *habeas* claim that was presented to the state court but rejected on "an independent and adequate state ground." *Id*. (citing *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991)).

The petitioner may overcome procedural default where "the petitioner can demonstrate both cause for and prejudice stemming from that default, *or* he can establish that the denial of relief will result in a miscarriage of justice." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004) (internal citations omitted) (emphasis in original).

## ANALYSIS

Prior to addressing the merits of Petitioner's § 2254 petition, "the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Johnson v. Foster*, 786 F.3d 501, 504 (7th Cir. 2015) (citing *Coleman v. Thompson*, 501 U.S. 722, 731 (1991)). Therefore, "federal courts will not review a *habeas* petition unless the prisoner has fairly presented his claims throughout at least one complete round of state-court review," on direct appeal of the prisoner's conviction, or in postconviction proceedings. *Id*. This requirement consists of two components. First, a *habeas* claim "must be exhausted, meaning that there is no remaining state court with jurisdiction." *Id*. Second, "exhaustion must not be attributable to the petitioner's failure to comply with the state court system's procedural rules." *Id*. If either of these two components fail to be fulfilled for any one of the petitioner's claims, that claim will be "procedural[ly] default[ed]." *Id*. (citing *Woodford v. Ngo*, 548 U.S. 81, 92 (2006)). Only once a claim is properly exhausted may it have the opportunity to satisfy § 2254(d).

*Claims A, B, D, F, G, I & J(2) - J(5)*

Claims A, B, D, F, G, I, and J(2) - J(5) are procedurally defaulted because they were not raised "in one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Claims A, B, C, and D were all raised in Petitioner's appellate brief on direct appeal to the Appellate Court of Illinois. (*See* State Ct. Rec. Exh. B.) However, Petitioner only presented claim C in his direct appeal (PLA) to the Illinois Supreme Court. (*See* State Ct. Rec. Exh. D.) By omitting claims A, B, and D from his PLA, Petitioner failed to properly exhaust those claims in the state's appellate review process. Therefore, claims A, B, and D are procedurally defaulted.

Similarly, claims F, G, I, and J(2) - J(5) are also procedurally defaulted. Claims F - J were all presented in Petitioner's petition for postconviction relief to the Circuit Court of Kane County. (*See* State Ct. Rec. Exh. F.) Petitioner did not present these claims in his postconviction appeal to the Appellate Court of Illinois and his PLA to the Illinois Supreme Court. (State Ct. Rec. Exh. H and L.)

The Seventh Circuit states that "[a] federal court may excuse a procedural default if the *habeas* petitioner establishes that (1) there was good cause for the default and consequent prejudice, or (2) a fundamental miscarriage of justice would result if the defaulted claim is not heard (internal citations omitted). *Foster*, 786 F.3d at 505 (citing *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Schlup v. Delo*, 513 U.S. 298, 315 (1995). The petitioner presents no support to justify excusal.

*Claims C, E, H, J(1) & J(6)*

Claims C, E, H, J(1), and J(6) were properly exhausted. Claim C was raised in both Petitioner's direct appeal to the Appellate Court of Illinois and PLA to the Illinois Supreme Court. (State Ct. Rec. Exh. B and D.) Additionally, claims E, H, J(1), and J(6) were raised in Petitioner's postconviction petition, postconviction appeal, and postconviction PLA to the Illinois Supreme Court. (State Ct. Rec. Exh. F, H, and L.) Because there are no further state courts to appeal these claims to, the first component of exhaustion is satisfied. Additionally, the exhaustion of these claims was not "attributable to the petitioner's failure to comply with the state court system's procedural rules." *Foster* 786 F.3d at 504. Rather, it was due to exhaustion of appellate review, both on direct appeal and through postconviction proceedings.

9

*State Court Decisions*

Section 2254(a) states that Petitioner may obtain federal *habeas* relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Supreme Court states that "[a] federal habeas court will not review a claim rejected by a state court" if the state court decision "rests on a state law ground that is independent of the federal question." *Walker v. Martin*, 562 U.S. 307, 316 (2011). Based on this standard, claims C and E are not questions for a district court to resolve.

Claim C alleges that the trial court erred in ruling that Escalante's prior convictions were inadmissible for impeachment purposes. (Resp. Ans. at 10.) Claim E alleges that "newly discovered evidence [concerning Queen Mari's ownership of the house where the gang meeting occurred] calls into question the state witnesses' credibility and their testimony regarding [petitioner's] alleged confession to shooting or [role] in the crime." (Resp. Ans. at 10 (quoting Dkt. 1 at 13.).) Both claims present an issue of state evidence law, not "a violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) ("it is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts") (emphasis in original). Therefore, neither claim is suitable for *habeas* review.

*Ineffective Assistance of Counsel*

The Supreme Court has recognized that, pursuant to the Sixth Amendment, "the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970)). A claim of ineffective assistance of counsel is governed by the *Strickland* standard. *People v. Petrenko*, 931 N.E.2d 1198, 1203 (Ill. 2010). This standard possesses two components. First, Petitioner "must

show that counsel's performance was deficient," meaning that counsel's errors were "so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687 (internal quotations omitted). Second, petitioner must show that counsel's "defective performance prejudiced the defense," meaning that "counsel's errors were so serious as to deprive [petitioner] of a fair trial, a trial whose result is reliable." *Id*.

When § 2254(d) applies, the question is no longer whether counsel's actions were reasonable. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Rather, the question is "whether there is a reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. "Establishing that a state court's application of *Strickland* [is] unreasonable under § 2254(d) is difficult." *Id*. Furthermore, the standard created by § 2254(d) is "highly deferential." *Id*.

In claims J(1) and H, Petitioner argues that trial counsel was ineffective for failing to object to the trial court's failure to comply with Illinois Supreme Court Rule 431(b). (Resp. Ans. at 7.) Specifically, Petitioner "contends that trial and appellate counsel were ineffective for not challenging the trial court's *voir dire* of prospective jurors because the trial court failed to fully explain the *Zehr* principles." (State Ct. Rec. Exh. K at 12.) Illinois Supreme Court Rule 431(b) requires that the trial court ask prospective jurors whether they understand and accept four different principles of law. Ill. Sup. Ct. R. 431(b); *see also People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984).

The trial court set forth each of the four principles to the prospective jurors. (State Ct. Rec. Exh. K at 13-14.) But rather than allow each prospective juror the opportunity to express that he or she understood and accepted each of the principles enumerated by Rule 431(b), the trial court asked the prospective jurors whether any of them had a "quarrel" with any of the principles. (State Ct. Rec. Exh. K at 13-14.) On appeal, Petitioner argued that the mishandling

11

of the *Zehr* principles was improper. (State Ct. Rec. Ex. K at 14.) The state appellate court found that despite the trial court's improper presentation of the *Zehr* principles, Petitioner failed to show prejudice from trial counsel's failure to object or from appellate counsel's failure to raise the argument on direct appeal. (State Ct. Rec. Exh. K. at 15, 18.)

Rule 431(b) is intended to ensure a fair and impartial jury, but it is not an indispensible component of one. *See People v. Glasper*, 917 N.E.2d 401, 416 (Ill. 2009). Even in situations where a trial court neglects to "observe the requirements of Rule 431(b), the court must consider whether any error is preserved, and, if it is not, whether the [petitioner] is able to show plain error." (State Ct. Rec. Exh. K at 17.) To do so, the petitioner must demonstrate that he has "an arguable claim of ineffective assistance" by showing that his attorney "performed below an objective standard of reasonableness and that he was arguably prejudiced." (State Ct. Rec. Exh. K at 18.) Petitioner fails to demonstrate that he suffered prejudice at trial as a result of the trial court's improper Rule 431(b) questioning. Thus, absent evidence of prejudice as a result of counsel's failure to object or failure to raise the argument on direct appeal, the state appellate court was reasonable in its conclusion.

In claim J(6), Petitioner argues that trial counsel was ineffective for failing to investigate the sale of Queen Mari's house and impeach Ramos with that information. (Resp. Ans. at 7.) The state appellate court rejected this argument on the basis that Petitioner failed to establish *Strickland* prejudice. (State Ct. Rec. Exh. K at 10, 12.) Their rejection was reasonable.

First, testimony regarding the meeting at Queen Mari's house is not an issue central to the case. The state appellate court referred to this issue as "collateral" and not relevant to a material issue. (State Ct. Rec. Exh. K at 9.) Specifically, the appellate court reasoned that whether a meeting could have taken place at Queen Mari's house is "unrelated to the issue of whether

12

defendant shot and caused the death of Arce." (*Id*.) Even if Queen Mari had testified in accordance with her affidavit, the evidence would have been sufficient to find petitioner guilty beyond a reasonable doubt. (*Id*. at 10.)

Second, there is considerable doubt as to whether Ramos's testimony was impeachable. Even accepting it was impossible for a meeting to have taken place at Queen Mari's house (the house she owned then sold in April 1989), a meeting could have still occurred at Queen Mari's "house," a term loosely applied to where she was residing at the time. (*Id*. at 9, 10.)

Third, the impeachment of Ramos's testimony would not sufficiently alter the testimony of Jose Hernandez (claiming another meeting occurred where Angel Luciano issued shoot-but-not-kill orders against Willie Arce and where Petitioner volunteered to do the job), or Carlos Escalante (claiming Petitioner admitted shooting Willie and showed him the gun that he used). Petitioner fails to show ineffective assistance of counsel; thus claims J(1), J(6), and H are foreclosed by § 2254(d).

*Appealability*

"A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. In addition, a party may not appeal the denial but may seek a certificate from the court of appeals under Federal Rules of Appellate Procedure 22. Seventh Circuit Rule 22(b) states: "In a *habeas corpus* proceeding in which detention complained of arises from process issued by a state court, or in a 28 U.S.C. § 2255 proceeding, the applicant cannot take an appeal unless a circuit justice or a district court judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."

13

To obtain a certificate of appealability, petitioner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Id*. Petitioner fails to make this demonstration. Thus, a certificate of appealability shall not issue.

## CONCLUSION

For all the reasons discussed above, Petitioner's Petition for Writ of *Habeas Corpus* is denied. Additionally, a certificate of appealability shall not issue.

Date:    August 20, 2015

JOHN W. DARRAH
United States District Court Judge